M. Elizabeth Graham, Esq. (Cal. Bar No. 143085)
**GRANT & EISENHOFER P.A.**
201 Mission Street, Suite 1200
San Francisco, CA 94105
Telephone: (415) 293-8210
Facsimile: (415) 789-4367
Email: egraham@gelaw.com

*Attorney for Plaintiff the Cleveland Bakers*
*and Teamsters Pension Fund*

*[Additional Counsel on Signature Page]*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN JOSE DIVISION

| | |
|---|---|
| CLEVELAND BAKERS AND TEAMSTERS PENSION FUND, Individually and on behalf of all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> NETFLIX, INC., REED HASTINGS, THEODORE SARANDOS, SPENCER NEUMANN, and GREGORY PETERS, <br><br> Defendants. | Case No. <br><br> **CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** <br><br> <u>DEMAND FOR JURY TRIAL</u> |

Plaintiff the Cleveland Bakers and Teamsters Pension Fund ("Plaintiff") individually and on behalf of all others similarly situated, by and through its attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, its counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Netflix, Inc. ("Netflix" or the "Company") with the United States Securities and Exchange Commission (the "SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Netflix; and (c) review of other publicly available information concerning Netflix.

## NATURE OF THE ACTION AND OVERVIEW

1.      This is a class action on behalf of persons and entities that purchased or otherwise acquired Netflix common stock between January 19, 2021 and April 19, 2022, inclusive (the "Class Period"). Plaintiff pursues claims against Defendants for violations of the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Netflix is an entertainment company that creates and distributes television series, documentaries, and feature films on its eponymous streaming platform.  A primary metric Netflix uses to measure growth is the net number of new paid subscriptions (often referred to as "paid net adds") on its platform.

3.      On January 20, 2022, after the market closed, Netflix reported paid net adds of 8.3 million subscribers during the fourth quarter of 2021, shy of its 8.5 million forecast. The Company also provided weak paid net add guidance of 2.5 million subscribers for the first quarter of 2022, well under the prior year period's 4.0 million paid net adds.

4.      On this news, the Company's stock price fell $110.75, or nearly 22%, to close at $397.50 per share on January 21, 2022, on unusually heavy trading volume.

5.    On April 19, 2022, after the market closed, Netflix reported that instead of gaining 2.5 net subscriptions, it had lost 200,000 subscriptions during the first quarter of 2022.   The Company disclosed, belatedly, that account sharing and competition from other services were hampering growth.

6.    On this news, the price of Netflix stock price fell $122.42, or over 35%, to close at $226.19 per share on April 20, 2022, on unusually heavy trading volume.

7.    Throughout the Class Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors that: (1) account sharing by customers and increased competition from other streaming services were becoming significant headwinds; (2) the Company was experiencing difficulties retaining customers; (3) as a result of the foregoing, the Company's growth was decelerating; (4) as a result of the foregoing, the Company's financial results were being adversely affected; and (5) as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially false and/or misleading and/or lacked a reasonable basis.

8.    As a result of Defendants' wrongful acts and omissions, and the precipitous declines in the price of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

9.    The claims asserted herein arise under Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)) and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5), and under Section 20(a) of the Exchange Act (15 U.S.C. § 78t(a)).  This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

10.    Venue is proper in this Judicial District under 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) because Netflix's principal place

of business lies in Los Gatos, California, which is within this Judicial District. In addition, many of the violations of the federal securities laws alleged herein were made within this Judicial District.

11.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including but not limited to the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

12.     Plaintiff the Cleveland Bakers and Teamsters Pension Fund, as set forth in the accompanying certification, incorporated by reference herein, purchased Netflix securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and misleading statements and material omissions alleged herein.

13.     Defendant Netflix is incorporated under the laws of Delaware and has its principal executive offices in Los Gatos, California. Netflix's common stock trades on the NASDAQ under the symbol "NFLX."

14.     Defendant Reed Hastings ("Hastings") was the Co-Chief Executive Officer ("Co-CEO"), President, and Chairperson of the Company at all relevant times.

15.     Defendant Ted Sarandos ("Sarandos") was the Co-CEO, Chief Content Creator, and a director of the Company at all relevant times.

16.     Defendant Spencer Neumann ("Neumann") was the Company's Chief Financial Officer ("CFO") at all relevant times.

17.     Defendant Gregory Peters ("Peters") was the Company's Chief Operating Officer and Chief Product Officer at all relevant times.

18.     Defendants Hastings, Sarandos, Neumann, and Peters (collectively the "Individual Defendants"), possessed and exercised their power and authority to control the contents of the Company's SEC filings, press releases, and other market

communications.  They were provided with copies of the Company's SEC filings, press releases, and statements in earnings calls, which were later shown to be misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected or supplemented so as to not be materially misleading or incomplete.  Because of their control over the Company, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading.  The Individual Defendants are liable for the false statements and omissions pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### Background

19.     Netflix primarily operates an entertainment platform that offers TV series, documentaries, feature films, and mobile games across a variety of genres and languages. It also offers a DVD-by-mail service in the U.S.

### Materially False and Misleading Statements

20.     The Class Period begins on January 19, 2021.  On that date, the Company reported its fourth quarter 2020 financial results, stating in relevant part:

> Average paid streaming memberships increased 23% year over year in Q4, while average revenue per membership was flat year over year both on a reported and foreign exchange (F/X) neutral basis. Revenue was 1% higher than our guidance forecast, as paid net adds exceeded our 6.0m projection by 2.5m. Operating margin of 14.4% (a 600bps increase from Q4'19) also came in above our guidance, due to higher-than-expected revenue. EPS of $1.19 vs. $1.30 a year ago included a $258m non-cash unrealized loss from F/X remeasurement on our Euro denominated debt.
>
> For the full year, our 37m paid net additions represented a 31% increase from 2019's 28m paid net adds. We're becoming an increasingly global service with 83% of our paid net adds in 2020 coming from outside the UCAN region. Our EMEA region accounted for 41% of our full year paid net adds, while APAC was the second largest

contributor to paid net additions with 9.3m (up 65% year over year).

21.    During the earnings call that day, Defendant Hastings claimed that consumers are "interested and willing to pay more for more content because they're hungry for great stories," and that they would "get that content" by going to other platforms in addition to Netflix.  When an analyst posited that the addition of new streaming services "expands the pie . . . for streaming in general" and could "accelerate growth," Defendant Peters responded, "I think you're right."

22.    On April 20, 2021, Netflix announced its first quarter 2021 financial results, stating in relevant part:

> Average revenue per membership rose 6% year over year, or 5%, excluding a foreign exchange impact of +$80m. Operating income of $2 billion vs. $958 million more than doubled vs. Q1'20. This exceeded our guidance forecast primarily due to the timing of content spend. EPS of $3.75 vs. $1.57 a year ago included a $253m non-cash unrealized gain from F/X remeasurement on our Euro denominated debt.
>
> The extraordinary events of Covid-19 led to unprecedented membership growth in 2020, as it pulled forward growth from 2021, and delayed production across every region. In turn, we ended 2020 with a bigger membership and revenue base than we would otherwise have had, contributing to record Q1'21 revenues. And since we were still ramping production levels late last year, we had lower content spend in Q1'21 - content amortization only grew 9.5% year over year in Q1'21 vs. 17% in FY20. The result was a 10 percentage point year over year jump in our operating margin to 27% in Q1, which is an all-time high.
>
> As we discussed in past letters, these dynamics are also contributing to a lighter content slate in the first half of 2021, and hence, we believe slower membership growth. In Q1, paid net additions of 4m were below our 6m guidance (and the 16m net additions in the year ago quarter) primarily due to acquisition, as retention in Q1 was in line with our expectations. We don't believe competitive intensity materially changed in the quarter or was a material factor in the variance as the over-forecast was across all of our regions. We also saw similar percentage year-over-year declines in paid net adds in all regions . . . , whereas the level of competitive intensity varies by country.

23.     During that day's earnings call, Defendant Neumann assured investors that the "business remains healthy" despite "noise in the near term" related to the pandemic.   Defendant Hastings downplayed concerns over the competitive environment, claiming that the industry is "intensely competitive, but it always has been."

24.     On July 20, 2021, Netflix announced its second quarter 2021 financial results, stating in relevant part:

> Revenue growth was driven by an 11% increase in average paid streaming memberships and 8% growth in average revenue per membership (ARM). ARM rose 4%, excluding a foreign exchange (FX) impact of +$277m. Operating margin of 25.2% expanded 3 percentage points compared with the year ago quarter. EPS of $2.97 vs. $1.59 a year ago included a $63m non-cash unrealized loss from FX remeasurement on our Euro denominated debt.

> The pandemic has created unusual choppiness in our growth and distorts year-over-year comparisons as acquisition and engagement per member household spiked in the early months of COVID. In Q2'21, our engagement per member household was, as expected, down vs. those unprecedented levels but was still up 17% compared with a more comparable Q2'19. Similarly, retention continues to be strong and better than pre-COVID Q2'19 levels, even as average revenue per membership has grown 8% over this two-year period, demonstrating how much our members value Netflix and that as we improve our service we can charge a bit more.

> We added 1.5m paid memberships in Q2, slightly ahead of our 1.0m guidance forecast. The APAC region represented about two-thirds of our global paid net adds in the quarter. As expected, Q2 paid memberships in the UCAN region were slightly down sequentially (-0.4m paid net adds). We believe our large membership base in UCAN coupled with a seasonally smaller quarter for acquisition is the main reason for this dynamic. This is similar to what we experienced in Q2'19 when our UCAN paid net adds were -0.1m; since then we've added nearly 7.5m paid net adds in UCAN.

25.     Speaking at the earnings call that day, Defendant Neumann attributed the "choppiness" in growth to the after-effect of the "big pull forward in 2020" and

reassured investors that the "business is performing well." Neumann emphasized that Netflix was "roughly 20% penetrated in broadband homes," and with 800 million to 900 million worldwide that could potentially buy a Netflix subscription there was no reason why Netflix could not "be in all or most of those homes over time if we're doing our job." In the United States and Canada, Neumann said that only 26% of viewing consumption was through a streaming service, within which Netflix was only 7% of consumption.

26. On October 19, 2021, Netflix announced its third quarter 2021 financial results in a letter to shareholders that stated, in relevant part:

> After a lighter-than-normal content slate in Q1 and Q2 due to COVID-related production delays in 2020, we are seeing the positive effects of a stronger slate in the second half of the year. In Q3, we grew revenue 16% year over year to $7.5 billion, while operating income rose 33% vs. the prior year quarter to $1.8 billion. We added 4.4m paid net adds (vs. 2.2m in Q3'20) to end the quarter with 214m paid memberships. We're very excited to finish the year with what we expect to be our strongest Q4 content offering yet, which shows up as bigger content expense and lower operating margins sequentially.

> *     *     *

> We under-forecasted paid net adds for the quarter (4.4m actual vs. our 3.5m projection), while ending paid memberships of 214m was within 0.4% of our forecast. For the second consecutive quarter, the APAC region was our largest contributor to membership growth with 2.2m paid net adds (half of total paid net adds) as we are continuing to improve our service in this region. In EMEA, paid net adds of 1.8m improved sequentially vs. the 188k in Q2 as several titles had a particularly strong impact. The UCAN and LATAM regions grew paid memberships more slowly. These regions have higher penetration of broadband homes although we believe we still have ample runway for growth as we continue to improve our service.

> As a reminder, the quarterly guidance we provide is our actual internal forecast at the time we report and we strive for accuracy. For Q4'21, we forecast paid net adds of 8.5m, consistent with Q4'20 paid net additions. For the full year 2021, we forecast an operating margin of 20% or slightly better. This means that Q4'21 operating margin will be approximately 6.5% compared with 14% in Q4'20. The year over year decline in operating margin is due mostly to our

backloaded big content release schedule in this Q4, which will result in a roughly 19% year over year increase in content amortization for Q4'21 (compared with ~8% growth year to date).

27.     Netflix held a conference call that day to discuss the financial results with analysts and investors. During the call, Defendant Neumann stated that "throughout the quarter, the business remained healthy as it had been throughout the year with churn at low levels, down prior to the comparable periods both in 2020 and two years ago pre-COVID in 2019." He also stated that management "expect[ed] to continue in terms of that healthy retention and then this kind of acceleration as we get past those initial market reopenings with COVID [and] past the COVID pull forwarding into the strength of our slate . . . ."

28.     The above statements identified in ¶¶ 21-28 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors that: (1) account sharing by customers and increased competition from other streaming services were becoming significant headwinds; (2) the Company was experiencing difficulties retaining customers; (3) as a result of the foregoing, the Company's growth was decelerating; (4) as a result of the foregoing, the Company's financial results were being adversely affected; and (5) as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially false and/or misleading and/or lacked a reasonable basis.

**The Truth is Gradually Revealed**

29.     On January 20, 2022, after the market closed, Netflix revealed that it had "slightly over-forecasted paid net adds in Q4." In a letter to shareholders, Netflix announced its fourth quarter 2021 financial results and stated, in relevant part (all emphases herein are added):

Full year revenue of $30 billion grew 19% year over year while operating income of $6.2 billion rose 35% year over year. We finished Q4 with 222m paid memberships (with

8.3m paid net adds in Q4). Even in a world of uncertainty and increasing competition, we're optimistic about our long-term growth prospects as streaming supplants linear entertainment around the world.

\*     \*     \*

***We slightly over-forecasted paid net adds in Q4 (8.3m actual compared to the 8.5m paid net adds in both the year ago quarter and our beginning of quarter projection).*** For the full year 2021, paid net adds totaled 18m vs 37m in 2020. Our service continues to grow globally, with more than 90% of our paid net adds in 2021 coming from outside the UCAN region.

Nonetheless, our UCAN region added 1.2m paid memberships in Q4'21 (vs. 0.9m last year), marking our strongest quarter of member growth in this region since the early days of COVID-19 in 2020. In APAC, we increased paid memberships by 2.6m (vs. 2.0m in the year ago quarter) with strong growth in both Japan and India. EMEA was our largest contributor to paid net adds in Q4 (3.5m vs. 4.5m in the prior year period) and the region delivered record quarterly revenue, exceeding $2.5 billion for the first time. LATAM paid net adds totaled 1.0m vs. 1.2m last year.

\*     \*     \*

***For Q1'22, we forecast paid net adds of 2.5m vs. 4.0m in the year ago quarter. Our guidance reflects a more back-end weighted content slate in Q1'22*** (for example, *Bridgerton* S2 and our new original film *The Adam Project* will both be launching in March). ***In addition, while retention and engagement remain healthy, acquisition growth has not yet re-accelerated to pre-Covid levels. We think this may be due to several factors including the ongoing Covid overhang and macro-economic hardship in several parts of the world like LATAM.***

\*     \*     \*

Consumers have always had many choices when it comes to their entertainment time - competition that has only intensified over the last 24 months as entertainment companies all around the world develop their own streaming offering. ***While this added competition may be affecting our marginal growth some, we continue to grow in every country and region in which these new streaming alternatives have launched.*** This reinforces our view that the greatest opportunity in entertainment is the transition from linear to streaming and that with under 10% of total TV screen time in the US, our biggest market, Netflix has tremendous room for growth if we can continue to improve our service.

---

30.     The same day, Netflix held a conference call to discuss the financial results with analysts and investors. During the call, Defendant Neumann stated that "overall, the business was healthy. Retention was strong. Churn was down." He continued that "acquisition was growing, just not growing quite as fast as we were perhaps hoping or forecasting," which was "probably a bit of just overall COVID overhang that's still happening . . . [and] some macroeconomic strain in some parts of the world . . . ."

31.     On this news, the Company's stock price fell $110.75, or nearly 22%, to close at $397.50 per share on January 21, 2022, on unusually heavy trading volume.

32.     On January 27, 2022, Netflix filed with the SEC on Form 10-K its annual report for the period ended December 31, 2021.  Therein, the Company provided the following risk disclosures:

> If our efforts to attract and retain members are not successful, our business will be adversely affected.

> We have experienced significant membership growth over the past several years. Our penetration and growth rates vary between the jurisdictions where we provide our service. In countries where we have been operating for many years or where we are highly penetrated, our membership growth is slower than in newer or less penetrated countries. Our ability to continue to attract and retain members will depend in part on our ability to consistently provide our members in countries around the globe with compelling content choices, effectively drive conversation around our content and service, as well as provide a quality experience for choosing and enjoying TV series, documentaries, feature films and mobile games. Furthermore, the relative service levels, content offerings, pricing and related features of competitors to our service may adversely impact our ability to attract and retain memberships. Competitors include other entertainment video providers, such as MVPDs, and streaming entertainment providers (including those that provide pirated content), video gaming providers, as well as user-generated content, and more broadly other sources of entertainment that our members could choose in their moments of free time.

> If consumers do not perceive our service offering to be of value, including if we introduce new or adjust existing features, adjust pricing or service offerings, or change the mix of content in a manner that is not favorably received by them, we may not be able to attract and retain members. We have recently expanded our entertainment video offering to include games. If our efforts to

develop and offer games are not valued by our current and future members, our ability to attract and retain members may be negatively impacted. We may, from time to time, adjust our membership pricing, our membership plans, or our pricing model itself, which may not be well-received by consumers, and which may result in existing members canceling our service or fewer new members joining our service. In addition, many of our members rejoin our service or originate from word-of-mouth advertising from existing members. If our efforts to satisfy our existing members are not successful, we may not be able to attract members, and as a result, our ability to maintain and/or grow our business will be adversely affected. Members cancel our service for many reasons, including a perception that they do not use the service sufficiently, the need to cut household expenses, availability of content is unsatisfactory, competitive services provide a better value or experience and customer service issues are not satisfactorily resolved. Membership growth is also impacted by seasonality, with the fourth quarter historically representing our greatest growth, as well as the timing of our content release schedules. We must continually add new memberships both to replace canceled memberships and to grow our business beyond our current membership base. While we currently permit multiple users within the same household to share a single account for non-commercial purposes, if multi-household usage is abused or if our efforts to restrict multi-household usage are ineffective, our ability to add new members may be hindered and our results of operations may be adversely impacted. If we do not grow as expected, given, in particular, that our content costs are largely fixed in nature and contracted over several years, we may not be able to adjust our expenditures or increase our (per membership) revenues commensurate with the lowered growth rate such that our margins, liquidity and results of operation may be adversely impacted. If we are unable to successfully compete with current and new competitors in providing compelling content, retaining our existing memberships and attracting new memberships, our business will be adversely affected.

33.   The above statements identified in ¶¶ 30-31, 33 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors that: (1) account sharing by customers and increased competition from other streaming services were becoming significant headwinds; (2) the Company was experiencing difficulties retaining customers; (3) as a result of the foregoing, the Company's growth was decelerating; (4) as a result of the foregoing, the Company's financial results were being adversely affected; and (5) as a result of the foregoing,

Defendants' positive statements about the Company's business, operations, and prospects were materially false and/or misleading and/or lacked a reasonable basis.

34.     On April 19, 2022, after the market closed, Netflix reported that it had lost 200,000 subscriptions during the first quarter of 2022, well under the paid net add guidance of 2.5 million. In a letter to shareholders, Netflix explained:

> ***Paid net additions were -0.2m compared against our guidance forecast of 2.5m and 4.0m in the same quarter a year ago.*** The suspension of our service in Russia and winding-down of all Russian paid memberships resulted in a -0.7m impact on paid net adds; excluding this impact, paid net additions totaled +0.5m. The main challenge for membership growth is continued soft acquisition across all regions. ***Retention was also slightly lower relative to our guidance forecast,*** although it remains at a very healthy level (we believe among the best in the industry). Recent price changes are largely tracking in-line with our expectations and remain significantly revenue positive.

> In EMEA (-0.3M paid net adds, or +0.4m excluding the Russia impact), we saw a slowdown in our business in Central and Eastern Europe in March, coinciding with Russia's invasion of Ukraine. Paid net additions in LATAM totaled -0.4M; similar to recent quarters, we believe a combination of forces including macroeconomic weakness and our price changes (F/X neutral ARM grew 20% year over year) were a drag on our membership growth. UCAN paid net adds of -0.6M was largely the result of our price change which is tracking in-line with our expectations and is significantly revenue positive. We're making good progress in APAC where we are seeing nice growth in a variety of markets including Japan, India, Philippines, Thailand and Taiwan.

> As a reminder, the quarterly guidance we provide is our actual internal forecast at the time we report. ***For Q2'22, we forecast paid net additions of -2.0m vs. +1.5m in the year ago quarter. Our forecast assumes our current trends persist (such as slow acquisition and the near term impact of price changes) plus typical seasonality (Q2 paid net adds are usually less than Q1 paid net adds).*** We project revenue to grow approximately 10% year over year in Q2, assuming roughly a mid-to-high single digit year over year increase in ARM on a F/X neutral basis. We still target a 19%-20% operating margin for the full year 2022, assuming no material swings in F/X rates from when we set this goal in January of 2022.

35.     The letter to shareholders stated that Netflix is "not growing revenue as fast as we'd like." It further stated: "COVID clouded the picture by significantly increasing our growth in 2020, leading us to believe that most of our slowing growth

in 2021 was due to the COVID pull forward." However, Netflix newly attributed the slowing revenue growth to four factors, including rampant account sharing and competition with other streaming services. Specifically, the letter stated, in relevant part:

> First, it's increasingly clear that the pace of growth into our underlying addressable market (broadband homes) is partly dependent on factors we don't directly control, like the uptake of connected TVs (since the majority of our viewing is on TVs), the adoption of on-demand entertainment, and data costs. We believe these factors will keep improving over time, so that all broadband households will be potential Netflix customers.

> Second, in addition to our 222m paying households, **_we estimate that Netflix is being shared with over 100m additional households, including over 30m in the UCAN region._** Account sharing as a percentage of our paying membership hasn't changed much over the years, but, coupled with the first factor, means it's harder to grow membership in many markets - an issue that was obscured by our COVID growth.

> Third, competition for viewing with linear TV as well as YouTube, Amazon, and Hulu has been robust for the last 15 years. **_However, over the last three years, as traditional entertainment companies realized streaming is the future, many new streaming services have also launched._** While our US television viewing share, for example, has been steady to up according to Nielsen, we want to grow that share faster. Higher view share is an indicator of higher satisfaction, which supports higher retention and revenue.

> Fourth, macro factors, including sluggish economic growth, increasing inflation, geopolitical events such as Russia's invasion of Ukraine, and some continued disruption from COVID are likely having an impact as well.

36.     On this news, the Company's share price fell $122.42, or over 35%, to close at $226.19 per share on April 20, 2022, on unusually heavy trading volume.

## CLASS ACTION ALLEGATIONS

37.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired Netflix common stock between January 19, 2021 and April 19, 2022, inclusive, and who were damaged thereby (the "Class").

Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

38.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Netflix's shares actively traded on the NASDAQ. Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class. Hundreds of millions of Netflix shares were traded publicly during the Class Period on the NASDAQ. Record owners and other members of the Class may be identified from records maintained by Netflix or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

39.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

40.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

41.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether Defendants' acts as alleged herein violated the federal securities laws;

(b)     whether Defendants' statements to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Netflix; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

42.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## LOSS CAUSATION

43.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

44.     During the Class Period, Plaintiff and the Class purchased Netflix's securities at artificially inflated prices and were damaged thereby. The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## SCIENTER

45.     As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. The Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Netflix, their control over, and/or receipt and/or modification of Netflix's allegedly materially misleading misstatements and/or their associations with the

Company which made them privy to confidential proprietary information concerning Netflix, participated in the fraudulent scheme alleged herein.

## **PRESUMPTION OF RELIANCE**

46.     The market for Netflix's securities was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, Netflix's securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Netflix's securities and market information relating to Netflix, and have been damaged thereby.

47.     During the Class Period, the artificial inflation of Netflix's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Netflix's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of Netflix and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company shares. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

48.     At all relevant times, the market for Netflix's securities was an efficient market for the following reasons, among others:

(a)    Netflix shares met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)    As a regulated issuer, Netflix filed periodic public reports with the SEC and/or the NASDAQ;

(c)    Netflix regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    Netflix was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

49.    As a result of the foregoing, the market for Netflix's securities promptly digested current information regarding Netflix from all publicly available sources and reflected such information in Netflix's share price. Under these circumstances, all purchasers of Netflix's securities during the Class Period suffered similar injury through their purchase of Netflix's securities at artificially inflated prices and a presumption of reliance applies.

50.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein are predicated in part upon material omissions of fact that Defendants had a duty to disclose.

## NO STATUTORY SAFE HARBOR

51.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements described herein were not identified as "forward-looking" when made.  To the extent that there were any forward-looking statements, there was no meaningful cautionary language identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements described herein, Defendants are liable for those false forward-looking statements because, at the time each was made, the particular speaker knew that the particular forward-looking statement was false or misleading, and/or that the forward-looking statement was authorized and/or approved by an executive officer of Netflix who knew that those statements were false or misleading when made.

### COUNT I
### For violation of Section 10(b) of the Exchange Act and Rule 10b-5
### Against All Defendants

52.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

53.     During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Netflix's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

54.     Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course

of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Netflix's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

55.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Netflix's financial wellbeing and prospects, as specified herein.

56.     Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Netflix's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Netflix and its business operations and future prospects in light of the circumstances under which they were made not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

57.     Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these Defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these Defendants enjoyed significant personal contact and familiarity with the

other Defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these Defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

58.    Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Defendants' material misrepresentations and/or omissions were made knowingly or recklessly and for the purpose and effect of concealing Netflix's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

59.    As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Netflix's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants

during the Class Period, Plaintiff and the other members of the Class acquired Netflix's securities during the Class Period and were damaged thereby.

60. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Netflix was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Netflix securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

61. By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

62. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## COUNT II
### For violation of Section 20(a) of the Exchange Act
### Against the Individual Defendants

63. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

64. The Individual Defendants acted as controlling persons of Netflix within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings,

and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

65.    In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

66.    As set forth above, Netflix and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## **PRAYER FOR RELIEF**

67.    WHEREFORE, Plaintiff prays for judgment as follows:

(a)    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)    Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    Awarding such other and further relief as the Court may deem just and proper.

1

## **JURY DEMAND**

2          68.    Plaintiff Demands a jury trial.

3

DATED: May 31, 2022               **GRANT & EISENHOFER P.A.**
4                                 */s/ M. Elizabeth Graham*
                                  M. Elizabeth Graham, Esq. (Cal. Bar No.
5                                 143085)
                                  201 Mission Street, Suite 1200
6                                 San Francisco, CA 94105
                                  Telephone: (415) 293-8210
7                                 Facsimile: (415) 789-4367
                                  Email: egraham@gelaw.com
8
                                  Daniel L. Berger (*pro hac vice forthcoming*)
9                                 485 Lexington Avenue, Floor 29
                                  New York, NY 10017
10                                Tel: (646) 722-8500
                                  Email: dberger@gelaw.com
11
                                  *Attorneys for the Cleveland Bakers and*
12                                *Teamsters Pension Fund*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CERTIFICATION PURSUANT TO FEDERAL SECURITIES LAWS FOR
NETFLIX, INC. MATTER

I, Carl Pecoraro, on behalf of the Cleveland Bakers and Teamsters Pension Fund (the
"CBTPF"), hereby certify that:

1.      I am the Fund Chairman of the CBPTF.  I am fully authorized to enter into and
execute this Certification on behalf of the CBPTF.  I have reviewed the complaint in this matter
and authorized its filing.

2.      The CBTPF did not engage in transactions in the securities which are the subject
of these actions at the direction of plaintiff's counsel or in order to participate in this or any other
litigation under the securities laws of the United States.

3.      The CBTPF is willing to serve as a representative party on behalf of the class,
including providing testimony at deposition and trial, if necessary.

4.      The CBTPF has made no transactions during the class period in the debt or equity
securities that are the subject of this action except those set forth in the attached Schedule A.

5.      The CBTPF has not, within the three years preceding the date of this certification,
sought to serve or served as a representative party on behalf of a class in an action involving alleged
violations of the federal securities laws, except that the CBTPF currently serves as a class
representative in *Sjunde AP-Fonden et al. v. General Electric Company et al.*, No. 17 Civ. 08457
(JMF) (GWG) (S.D.N.Y.).

6.      The CBTPF will not accept any payment for serving as a representative party on
behalf of the class beyond its pro rata share of any recovery, unless ordered or approved by the
Court pursuant to section 27(a)(4) of the Securities Act, 15 U.S.C. § 77z-1(a)(4), or section
21D(a)(4) of the Securities Exchange Act, 15 U.S.C. § 78u-4(a)(4).

I declare under penalty of perjury that the foregoing is true and correct.

Executed this ___ day of May, 2022.

**Cleveland Bakers and Teamsters Pension Fund**

By:      _____
         Carl Pecoraro, Fund Chairman
         Cleveland Bakers and Teamsters Pension Fund